# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER, et al.**, <br><br> Plaintiffs, <br><br> v. <br><br> **FEDERAL ELECTION COMMISSION**, <br><br> Defendant, <br><br> **F8, LLC, et al.**, <br><br> Intervenor-Defendants. | Case No. 1:16-cv-00752 (TNM) |

## MEMORANDUM OPINION

Plaintiffs Campaign Legal Center and Democracy 21 claim that it was unlawful for the Federal Election Commission to decline to investigate three complaints that corporate entities committed "straw donor" violations of the Federal Election Campaign Act's prohibition on making "a contribution in the name of another person or knowingly permit[ting] [one's] name to be used to effect such a contribution." 52 U.S.C. § 30122; Compl. ¶¶ 1-2. Three of the alleged violators intervened as Defendants, and all parties have filed cross motions for summary judgment. Finding that there was a rational basis for the Commission's exercise of its prosecutorial discretion, the Court will grant summary judgment for all Defendants.

## I. BACKGROUND

### A. The Federal Election Commission's Enforcement Authority

The Federal Election Commission is an agency that "administer[s], seek[s] to obtain compliance with, and formulate[s] policy with respect to" the Federal Election Campaign Act

(the Act), and has "exclusive jurisdiction with respect to the civil enforcement of such provisions." 52 U.S.C. § 30106(b)(1). The Commission comprises "6 members appointed by the President, by and with the advice and consent of the Senate." *Id*. § 30106(a)(1). "No more than 3 members of the Commission . . . may be affiliated with the same political party." *Id*. "All decisions of the Commission with respect to the exercise of its duties and powers . . . shall be made by a majority vote of the members of the Commission." *Id*. § 30106(c). "The voting and membership requirements mean that, unlike other agencies—where deadlocks are rather atypical—[the Commission] will regularly deadlock as part of its *modus operandi*." *Pub. Citizen, Inc. v. Fed. Energy Regulatory Comm'n*, 839 F.3d 1165, 1171 (D.C. Cir. 2016).

"Any person" may file an administrative complaint with the Commission alleging a violation of Act. 52 U.S.C. § 30109(a)(1). "If the Commission . . . determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation," then the Commission "notif[ies] the person of the alleged violation," and begins "an investigation . . . which may include a field investigation or audit." *Id*. § 30109(a)(2). The Commission then votes on whether there is "probable cause" to believe that the person "has committed, or is about to commit, a violation of [the] Act." *Id*. § 30109(a)(4)(A)(i). If the Commission finds probable cause, it must attempt to remedy the violation informally, with a conciliation agreement ratified by four Commissioners. *Id*. If a conciliation agreement cannot be reached, then the Commission (again with the vote of four Commissioners) may institute a civil enforcement action in federal district court. *Id*. § 30109(a)(6)(A). If at any point the Commission dismisses an administrative complaint, the party who filed the complaint may file suit in this District, asserting that "the dismissal of the complaint . . . is contrary to law." *Id*. § 30109(a)(8).

Here, the Plaintiffs asked the Commission to enforce the Act's requirement that "political committees" must file publicly available reports detailing receipts and expenditures, 52 U.S.C. § 30104(a)–(b), and its straw donor prohibition: "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person." *Id*. § 30122. The Act defines "person" to include a "corporation." 52 U.S.C. § 30101(11).

**B. The Commission Dismisses Plaintiffs' Complaints**

This case involves three administrative complaints filed by the Plaintiffs in 2011-2013. Two of the complaints focused on $1 million donations made in March 2011 by limited liability companies (LLCs) Eli Publishing L.C. and F8 LLC, respectively, to a registered independent-expenditure-only political action committee (or super PAC) called Restore Our Future, Inc. R. at 78.[1] The Plaintiffs filed two complaints alleging that Steven Lund (who founded Eli Publishing) and others (who operated F8 LLC) were the true sources of the contributions. R. at 32. The complaints also asserted that the LLCs were "political committees" subject to reporting requirements under 52 U.S.C. § 30104. *Id*. Mr. Lund told news media that he made the donations through a corporation for "accounting advantages," and was not trying to hide them. R. at 78. The Commission's Office of General Counsel recommended finding reason to believe that Mr. Lund, both companies, and the unknown operators of F8 violated the straw donor prohibitions of 52 U.S.C. § 30122, but counseled taking no action on the political committee allegations. R. at 80.

---

[1] The relevant portions of the administrative record were filed as a Joint Appendix. ECF No. 42.

The third complaint concerns a series of donations totaling over $12 million from Specialty Investment Group Inc., and its subsidiary Kingston Pike Development LLC to FreedomWorks for America, another super PAC. R. at 79. William Rose was Specialty Group's CEO, president, and board chairman, and the sole manager of Kingston Pike, *id.*, and the Plaintiffs alleged that FreedomWorks board member Richard Stephenson made the contributions through Mr. Rose's companies, with assistance from Adam Brandon, a FreedomWorks' executive vice president. R. at 323. The Commission's General Counsel recommended finding reason to believe that Mr. Stephenson, Mr. Rose, both companies, FreedomWorks, and Mr. Brandon had violated the straw donor prohibition, but recommended against investigating the political committee allegations. R. at 80.[2]

---

[2] The Commission dismissed five administrative complaints in a single vote, so the Plaintiffs originally included all five in this suit. Judge John D. Bates ruled that the Plaintiffs lacked standing on two complaints, and dismissed that portion of the case. *Campaign Legal Ctr. v. Fed. Election Comm'n*, 245 F. Supp. 3d 119, 125 (D.D.C. 2017). But because the facts underlying all five complaints informed the Commission's decision, I will summarize the other two briefly.

One complaint focused on Edward Conard, who wanted to make a large contribution to Restore Our Future, a super PAC supporting Mitt Romney's candidacy for President. R. at 77. Concerned that publicity might endanger his family, Mr. Conard retained a global law firm to ask "whether he could create an entity for the sole purpose of making a [contribution] . . . [that] would not require full public disclosure of his name." *Id.* (alteration original) (citations and internal quotation marks omitted); Gov't. Mot. Summ. J. 26. Advised that he could accomplish this goal through a corporate LLC, Mr. Conard created W Spann LLC in March 2011. W Spann gave $1 million to Restore Our Future and almost immediately dissolved. R. at 77. In August 2011, after the contribution attracted significant news coverage, Mr. Conard made his role public and "asked . . . Restore Our Future to amend its reports to identify him as the contributor." R. at 78. The Commission's General Counsel recommended finding reason to believe a violation occurred in Mr. Conard's case.

The other complaint focused on contributions from Prazrakrel Michel, who created SPM Holdings, LLC to own his assets and receive his income. R. at 79. Mr. Michel "used the last of his personal funds not held by SPM" to donate $350,000 to a political committee called Black Men Vote, and then directed SPM to give $875,000 more. R. at 80. Black Men Vote disclosed the $875,000 only as an SPM contribution. *Id.* Mr. Michel later "acknowledged that he directed

In February 2016, the Commission deadlocked—three votes to three—on whether to find reason to believe that any violation had occurred and to proceed with an investigation. R. at 67-68, 543-44. As a result, the Commission voted unanimously to close the files and "[s]end the appropriate letters." *Id*. The letters informed the Plaintiffs of their right "to seek judicial review of the Commission's dismissal." R. at 70-71, 73-74, 546-47, 550-51. The Commissioners who voted against an investigation released a Statement of Reasons in April 2016, R. at 75-89, which "necessarily states the agency's reasons for acting as it did" because it comes from the Commission's "controlling group." *Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992). The dissenting Commissioners also provided a Statement of Reasons. R. at 90-94.

The Commission stated that it declined to find reason to believe a violation occurred as "an exercise of the Commission's prosecutorial discretion," *id*. at 77, because the Supreme Court's decision in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) created a sea change in campaign finance law, overturning the ban on corporate political speech and making it necessary to examine as "an issue of first impression" how Section 30122's straw donor ban applied to corporate contributions. R. at 75-76. The Commission also "kept . . . in mind" (1) that the Commission had previously applied the straw donor ban "almost exclusively" in situations involving "excessive and/or prohibited contributions," while the matters under review involved donations to super PACs not subject to such limitations, (2) that "Commission precedent has treated funds deposited into a corporate account and then used for contributions as the funds of that corporation," (3) that the Commission had "rejected an attribution rule that

---

. . . the contributions," and that they "were in some respects his contributions." *Id*. The General Counsel did not recommend finding reason to believe a violation occurred in this case. *Id*.

would deem the individual owners of corporate LLCs as the makers of those LLC's contributions,"[3] and (4) that "the speech rights recognized in *Citizens United* would be hollow if closely held corporations and corporate LLCs were presumed to be straw donors—thus, triggering investigations and potential punishment—each time they made contributions."  R. at 76.

The Commission therefore announced a new standard to evaluate straw donor allegations in this factual context, focused on "whether the funds used to make a contribution were intentionally funneled through a closely held corporation or corporate LLC for the purpose of making a contribution that evades the Act's reporting requirements, making the individual . . . the true source."  *Id*.  The Commission declined to proceed with investigations of Plaintiffs' complaints, concluding that "because past Commission decisions . . . may be confusing in light of recent legal developments[;] principles of due process, fair notice, and First Amendment clarity counsel against applying a standard to persons and entities that were not on notice of the governing norm."  *Id*.

The three dissenting Commissioners reasoned that "current law clearly prohibits contributors from using the names of LLCs to shield their identity from disclosure to the public," and that the issue presented was "not [] difficult."  R. at 91-92.  They acknowledged that "the ability of individuals and corporations to make unlimited contributions to super PACs is a post-*Citizens United* . . . phenomenon," but argued that "the longstanding prohibition against making contributions in the name of another remains unchanged and squarely applies in these cases."  R. at 92.  In a separate Statement, two dissenting Commissioners criticized the controlling

---

[3]  The term "corporate LLC" appears to refer to "[a]n LLC that elects to be treated as a corporation by the Internal Revenue Service."  11 C.F.R. § 110.1(g)(3).

Commissioners for delaying their decision, and challenged the purpose-focused standard they had announced. R. at 95-97. The controlling Commissioners defended their conduct and the proposed standard in a Supplemental Statement. R. at 98-101.

### C. Plaintiffs Challenge the Commission's Decision Not to Investigate

Plaintiffs filed this suit in April 2016, a few weeks after the Commission announced its reasoning. F8 LLC, Eli Publishing, and Steven Lund then intervened as defendants. Minute Order, June 30, 2016. The Commission moved to dismiss for lack of standing, Mot. Dismiss pg. i, ECF No. 13, and my colleague granted the motion in part, dismissing the Plaintiffs' challenge on two complaints, but allowing the remainder of the case to proceed. Mem. Op. 7-9. All parties then moved for summary judgment.

## II. LEGAL STANDARDS

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once this showing has been made, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

"The standard to be applied . . . in reviewing the [Commission's] decision not to investigate [a] complaint is whether the [Commission] has acted 'contrary to law.'" *Orloski v. Fed. Election Comm'n*, 795 F.2d 156, 161 (D.C. Cir. 1986); 52 U.S.C. § 30109(a)(5)(A). Under

this standard, a court's task is "not to interpret the statute as it [thinks] best[,] but rather the narrower inquiry into whether the Commission's construction was 'sufficiently reasonable' to be accepted." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39 (1981) (citations omitted). "The [Commission's] decision is 'contrary to law' if (1) the [Commission] dismissed the complaint as a result of an impermissible interpretation of the Act, or (2) if the [] dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski*, 795 F.2d at 161 (citations omitted). "This is an extremely deferential standard which requires affirmance if a rational basis for the agency's decision is shown." *Id*.

The parties agree that *Orloski* applies, Pl. Mot. Summ. J. 19; Interv-Def. Mot. Summ. J. 9; Gov't. Mot. Summ. J. 17, but disagree about the degree of deference that this case requires. The disagreement stems from the fact that "when a court's review turns on an interpretation of [the Act's] terms, the 'contrary to law' standard involves a straightforward application of the familiar two-step framework outlined in *Chevron*," *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 209 F. Supp. 3d 77, 86 (D.D.C. 2016), and an exercise of prosecutorial discretion also merits deference. *La Botz v. Fed. Election Comm'n*, 61 F. Supp. 3d 21, 33 (D.D.C. 2014). But no deference is warranted when a court reviews the Commission's interpretation of judicial precedent, "especially [] where . . the Supreme Court precedent, and subsequent interpretation, is based on constitutional concerns, an area of presumed judicial . . . competence." *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002) (citing *Akins v. Fed. Election Comm'n*, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc), *vacated on other ground*s, 524 U.S. 11 (1998)).

The Plaintiffs argue that no *Chevron* deference is warranted because the Commission's decision did not turn on its interpretation of the Act's terms, but on *Citizens United* and legal issues of notice, due process, and First Amendment speech rights.  Pls' Mot. Summ. J. 21-25.  In response, the Commission and the Intervenor-Defendants insist that deference is baked into the "contrary to law" standard itself.  *E.g.*, Gov't. Mot. Summ. J. 18 (citing *Democratic Senatorial Campaign Comm.*, 454 U.S. at 45 ("the Commission is precisely the type of agency to which deference should presumptively be afforded," which is part of why "Congress wisely provided that the Commission's dismissal of a complaint should be reversed only if 'contrary to law.'")).  And the Defendants argue that "[t]he case for deference is even more appropriate where, as here, the agency's decision not to proceed . . . is an exercise of its prosecutorial discretion."  Gov't. Mot. Summ. J. 18.  The Plaintiffs respond that the Commission did not exercise "the kind of [discretion] to which this Court owes deference," because "[t]he controlling Commissioners did not cite agency resources or likelihood of success as [their] rationale."  Pl.'s Reply at 5, ECF No. 36; *see La Botz*, 61 F. Supp. 3d at 33–34 ("An agency decision not to pursue a potential violation involves a complicated balancing of factors which are appropriately within its expertise, including whether agency resources are better spent elsewhere, whether its action would result in success, and whether there are sufficient resources to undertake the action at all.").

Here, applicable case law requires that I give deference to the Commission's decision.  First, the "contrary to law" standard is itself deferential.  *Democratic Senatorial Campaign Comm.*, 454 U.S. at 45.  A court cannot overturn the Commission's decision simply because it does not comport with the "best" interpretation of the statute, *id*. at 39, but only "if (1) the [Commission] dismissed the complaint as a result of an impermissible interpretation of the Act,

or (2) if the [] dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski*, 795 F.2d at 161 (citations omitted).

Second, this decision was not a direct "result" of the Commission's "interpretation of the Act," *see id.*, but an exercise of the Commission's "considerable prosecutorial discretion." *Nader v. Fed. Election Comm'n*, 823 F. Supp. 2d 53, 65 (D.D.C. 2011). The Commission recognized that the conduct at issue "could potentially violate section 30122," Admin Rec. 85, but concluded that the "[r]espondents did not have prior notice of the [Commission's] legal interpretation," and that due process and First Amendment principles counseled against investigation. *Id.* at 87-88. Even though the Commission did not explicitly rely on "agency resource[]" constraints or likelihood of success to support its decision, *cf. La Botz*, 61 F. Supp. 3d at 33–34, this decision still involved "a complicated balancing of a number of factors which are peculiarly within [the Commission's] expertise," including "whether the particular enforcement action requested best fits the agency's overall policies," and the fact that "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing." *Heckler*, 470 U.S. at 831. Moreover, the Commission's fair notice and due process concerns implicitly raise questions about the likelihood of success in a legal challenge involving these complaints. Although I will not defer to the Commission's interpretation of case law or the Constitution, "area[s] of presumed judicial, rather than administrative, competence," *Univ. of Great Falls*, 278 F.3d at 1341, the ultimate inquiry is whether "the [Commission] acted contrary to law by abusing its discretion." *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 236 F. Supp. 3d 378, 390 (D.D.C. 2017) (citations omitted). Abuse of discretion is "an extremely deferential standard which requires affirmance if a rational basis for

the agency's decision is shown." *Orloski*, 795 F.2d at 167 (citation omitted). "We are not here to run the agencies." *Fed. Election Comm'n v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986).

In sum, the Commission acted "contrary to law" only if it failed to show a rational basis for dismissing these complaints. *Orloski*, 795 F.2d at 167.[4]

## III. ANALYSIS

### A. The Commission's Decision Was Not Contrary to Law

With the applicable standard established, I am satisfied that the Commission provided a rational basis for its decision not to investigate, and the dismissals were therefore not contrary to law. The Plaintiffs rely heavily on the argument that "[a]pplication of section 30122 to corporate straw donors is . . . mandated by the plain language of the statute," and "necessary to effectuate Congress' interest in preventing the laundering of campaign money [to obscure] the true source[] of [] funds." Pls.' Mot. Summ. J. 25. But the Commission did not say otherwise. In fact, the Commission agreed that the plain language of Section 30122 applies to corporations, declaring that "[u]nder certain circumstances, closely held corporations and corporate LLCS may be considered straw donors under section 30122." R. at 86. And the Commission did *not* dismiss the complaints because it decided that the announced standard did not apply, but reasoned that "[r]espondents were not provided adequate notice that their conduct could potentially violation section 30122." *Id.* at 85. I therefore turn to the reasons on which the Commission did rely—

---

[4] This standard may not be phrased in the terms that the Plaintiffs request, but it seems to be nearly equivalent to the test that Plaintiffs apply in practice (despite their suggestion that a *de novo* standard might be appropriate). *Compare* Pls.' Mot. Summ. J. 31-32 ("the Court must determine whether the [Commission] has 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts and the choice made.'") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (alteration original) *with Orloski*, 795 F.2d at 167 (citation omitted) ("[t]his . . . standard [] requires affirmance if a rational basis for the agency's decision is shown.").

intertwined concerns of fair notice and due process in a post-*Citizens United* context, confusing Commission precedent, and the obligation to protect First Amendment speech—and conclude that the Commission supplied a rational basis for its decision.

The question of "whether, or under what circumstances, a closely held corporation or corporate LLC may be considered a straw donor" was an issue of first impression for the Commission. R. at 81, 75-76. The Supreme Court's decision in *Citizens United* held that "the Government may not suppress political speech on the basis of the speaker's corporate identity," and struck down the Act's ban on certain corporate speech, including corporate contributions. 558 U.S. at 337, 365 (describing and striking down 2 U.S.C. § 441b, a provision since moved to 52 U.S.C. § 30118).[5] Corporations' ability to make federal campaign contributions cast the Act's straw donor prohibition in a new light. The Act still said that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution," and defined "person" to include a "corporation," 52 U.S.C. §§ 30122, 30101(11), as both the controlling and dissenting Commissioners acknowledged. R. at 81, 92. But because corporations could now legally be donors, the Commission had to consider for the first time how and when a corporation might still break the law as a straw donor. R. at 81.

In the post-*Citizens United* context, the Commission's existing regulations and precedent were less than helpful. In the only regulation governing LLCs, the Commission required (and still requires) "partnership LLCs [and LLCs "with a single natural person member that does not elect to be treated as a corporation"] to attribute their contributions to their individual members[,]

---

[5]  The reasoning in *Citizens United* led the D.C. Circuit to invalidate the Act's contribution limits as applied to individuals' contributions to political committees that only made independent expenditures, *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 689 (D.C. Cir. 2010), and *SpeechNow* in turn compelled the Commission to allow corporations and labor organizations to make similar contributions without limit, R. at 75 n.1.

but provide[d] no similar instruction to corporate LLCs." R. at 85; 11 C.F.R. § 110.1(g). The Commission in fact "rejected [in 1998] a proposal to deem contributions by closely held corporate LLCs as contributions from their individual owners." R. at 85. And when investigating allegations of illegal corporate giving, the Commission had "treat[ed] funds deposited in a corporate account as the corporation's funds, even if the corporation's owner could legally convert them into his or her own funds." R. at 83. In a case the Commission decided in 1995, an individual "created a corporation to run a television ad and deposited his personal funds into the corporations account for the purpose of funding the ad," facts strikingly similar to some of the complaints at issue today. R. at 84-85. The Commission's General Counsel reasoned that the funds were corporate rather than personal, based on "well established principle[s] of corporate law." *Id*. (alteration in original). In sum, corporate LLCs were left with little guidance in determining when they might be considered straw donors. As the Commission explained, "it would be reasonable for Respondents to conclude that contributions made by their closely held corporations and corporate LLCs were lawful and not contributions in the name of another." *Id*. at 85.

In fact, even sophisticated lawyers were confused. Tasked by Mr. Conard with the question of "whether he could create an entity for the sole purpose of making a [contribution] . . . [that] would not require full public disclosure of his name," a law firm told Mr. Conard that he could legally do so through a corporate LLC. R. at 77 (alteration original) (citations and internal quotation marks omitted); Gov't. Mot. Summ. J. 26; *see also supra* n.2. And the Commission's General Counsel shifted its standard over the course of the five complaints, originally focusing on who exercised "dominion or control" over a corporation's contribution, and later deciding that the Commission must take a holistic view "of the transaction itself and the arrangement between

13

the parties to determine who in fact 'made' a given contribution."  R. at 82 (citations omitted).

As the Commission pointed out, this is "presumably because 'direction or control'[are]

necessarily present in all closely held corporations."  *Id*.  The fact that these attorneys found the

law difficult to apply supports the conclusion that the public lacked notice.

The Plaintiffs make several unavailing arguments in support of the proposition that it

would be "illogical, irreconcilable with the [Act's] plain text, and unsupported by any precedent"

for any of the complaint respondents to conclude that they could legally make anonymous

contributions using closely held corporations or corporate LLCs.  Pls.' Mot. Summ. J. 32.  First,

the Plaintiffs argue that corporations *had* contributed under the Act before *Citizens United* in the

"soft money" era preceding the Bipartisan Campaign Reform Act of 2002, Pls.' Mot. Summ. J.

30, when "federal law permitted corporations and unions . . . to contribute 'nonfederal money'—

also known as 'soft money'—to political parties for activities intended to influence state or local

elections."  *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 123 (2003), *overruled in part by*

*Citizens United*, 558 U.S. 310.  But *McConnell* itself explained that soft money is "nonfederal

money," the opposite of a "contribution[]" under the Federal Elections Campaign Act, which

(unsurprisingly) only applies to federal elections.  *Id*. at 123-124; 52 U.S.C. § 30101(8).  Even

though the "soft money" issue may have made Congress aware of similar issues with "corporate

political giving," Pls.' Reply at 13, the fact remains that corporations could *not* contribute under

the Act before *Citizens United* struck down 52 U.S.C. § 30118.

The Plaintiffs also argue that the issue was not new since the Commission had previously

faulted political committees for violating the straw donor prohibition.  *Id*. 32-33.  But as the

Commission points out, political committees could make contributions before *Citizens United*,

and indeed could be formed for that exact purpose.  Gov't. Mot. Summ. J. 27-28 (citing 52

U.S.C. § 30116(a)(1)-(2)).  Enforcement against political committees, therefore, does not present the same legal issue as enforcement against a closely held corporation or corporate LLC.

The Plaintiffs next argue that "the question of whether particular funds are 'corporate'" is different from "whether the corporation is the true source of those funds" for purposes of the straw donor prohibition.  Pls.' Mot. Summ. J. 36.  Fair enough.  But the Commission's point was not that prior regulations and precedent *established* the point in favor of the alleged violators, but that they might have reasonably been confused.  R. at 85.  And though the Plaintiffs argue that any alleged confusion is inconsistent with the regulation's "text and purpose," the only relevant Commission regulation—detailing the requirements for "[c]ontributions by limited liability companies"—does not tell corporate LLCs that they are fair targets for straw donor investigations.  11 C.F.R. § 110.1(g).  Instead, in the context of closely-held LLCs reporting contributions from the source partner or member, the regulation states that "[a]n LLC that elects to be treated as a corporation by the Internal Revenue Service . . . or an LLC with publicly-traded shares, shall be considered a corporation."  *Id*.  After *Citizens United*, corporations may make unlimited contributions to super PACs, and the regulation, combined with Commission precedent, suggested that corporate LLCs might be considered the true source of any contributions.  This does not establish that "section 30122 would not prohibit corporate straw donors."  Pls.' Mot. Summ. J. 36.  But it could create confusion, and that confusion supplies a rational basis for non-enforcement, especially when the Commission is proposing a governing enforcement standard for the first time.[6]

_____

[6]  Applying Section 30122 to closely held corporations and corporate LLCs is more complicated and difficult than applying the provision to individuals or larger companies and organizations. By their nature, these small corporations blur the lines between the individual and corporation, and thus blur the line between a "true" donor and a "straw" donor.  The Plaintiffs, by arguing that the complaint respondents "had precisely the same notice of the law as did an 'individual,

With this analysis under its belt, the Commission concluded that the "Respondents were not provided adequate notice that their conduct could potentially violate section 30122," R. at 85, a conclusion that finds good support in case law. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment," and a "punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Id.* (citations omitted). A rule fails this test not when it "may . . . be difficult to prove an incriminating fact but . . . [when] it is unclear as to what fact must be proved." *Id.*

---

partnership, committee, association . . . [or] labor organization,'" Pl.'s Mot. Summ. J. 30 (citing 52 U.S.C. 30101(11)), ignore this crucial point, and the Commission's prior wrestling with the issue embodied in 11 C.F.R. § 110.1(g).

The Plaintiffs also argue that this lack-of-notice conclusion is "not credible," and that "there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question." Pl.'s Mot. Summ. J. 39 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)) (other citation omitted). They argue that "[s]ince 2008, a three-Commissioner bloc has increasingly voted in lockstep to thwart enforcement of campaign finance law," *id.* at 40, which amounts to "an abdication of [the Commissioners'] statutory responsibilities," *id.* at 41 (citation omitted). To the extent that the Plaintiffs challenge the Commissions' dispositions of *other* complaints, I lack jurisdiction under 52 U.S.C. § 30109(a)(6)(A). And even if their factual claims are true, and part of the administrative record before the Commission when it reached its decision, *see Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013), none of it undermines the Commission's reasoning. "An administrative official is presumed to be objective . . . [and] mere proof that she has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980). Because of its bipartisan design, the Commission "will regularly deadlock as part of its *modus operandi*." *Pub. Citizen, Inc.*, 839 F.3d at 1171. The fact that these deadlocks occur is evidence of the Congressional scheme working, not malfunctioning.

"Unique among federal administrative agencies, the Federal Election Commission has as its sole purpose the regulation of core constitutionally protected activity—'the behavior of individuals and groups only insofar as they act, speak and associate for political purposes.'" *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 170 (D.C. Cir. 2003) (citation omitted).  In this context, vagueness and notice concerns carry special weight, since courts must be especially vigilant to prevent the chilling of First Amendment speech.  *Buckley v. Valeo*, 424 U.S. 1, 41 n.48 (1976) ("vague laws may not only trap the innocent by not providing fair warning or foster arbitrary and discriminatory application but also operate to inhibit protected expression by inducing citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.") (citations and internal quotation marks omitted); *Citizens United*, 558 U.S. at 324 ("Prolix laws chill speech for the same reason that vague laws chill speech: People 'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.') (citation omitted); *Fox Television Stations*, 567 U.S. at 253–54 (2012) ("regulated parties should know what is required of them so they may act accordingly . . . [and] precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.  When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.") (citation omitted).

Citing this case law, the Commission concluded that "applying section 30122 to Respondents . . . would not only create due process concerns but would risk chilling vitally important political speech that is strictly protected by the First Amendment."  R. at 87-88.  The Plaintiffs counter by arguing that "the dismissals . . . were contrary to both the well-recognized disclosure objectives of [the Act] and the First Amendment interests this disclosure is meant to advance: 'providing the electorate with information, deterring actual corruption and avoiding any

appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions.'" Pls'. Reply 16-17 (quoting *McConnell*, 540 U.S. at 196). But the Commission was well-aware of this First Amendment interest too. R. at 87 n.70 ("less than three weeks after the initial report was filed, five months before the first presidential primary was held, and over a year before the 2012 general election, Conard's identity and status as a contributor were disclosed to the public. Accordingly, little to no information harm was suffered by the public."). And disclosure's important role was just one of the competing First Amendment issues that the Commission had to consider.[7] Not only was it proper for the Commission to consider the importance of notice in the First Amendment context, it was also proper for the Commission to honor the core holding in *Citizens United* that "the Government may not suppress political speech on the basis of the speaker's corporate identity." *See* 558 U.S. at 365.[8]

The Commission has "unique prerogative to safeguard the First Amendment when implementing its congressional directives," *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 501 (D.C. Cir. 2016), and I conclude that its decision here was rational, and indeed "an able attempt to balance the competing values that lie at the heart of campaign finance law." *Id.* This

---

[7] And disclosure has its First Amendment drawbacks. *Buckley*, 424 U.S. at 64 ("we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment"); *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 175 (D.C. Cir. 2003) ("The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation") (citations omitted); *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 488 (D.C. Cir. 2016) ("these two values exist in unmistakable tension. Disclosure chills speech. Speech without disclosure risks corruption. And the Supreme Court's track record of expanding who may speak while simultaneously blessing robust disclosure rules has set these two values on an ineluctable collision course.")

[8] Plaintiffs also dispute the Commission's notice concerns as to the intervenors whose conduct post-dated the public outcry over W Spann's political contribution. Pls.' Reply 21. But the relevant notice date stems from some official statement by the Commission clarifying the rule— here, the Commission's Statement of Reasons—not mere negative publicity over a contribution.

was an issue of first impression, in a campaign finance environment remade by *Citizens United*, where existing Commission regulations and precedent offered few helpful clues about how the straw donor prohibition applied in real life to closely held corporations and corporate LLCs. Because the Commission furnished a rational basis for its decision, I conclude that it was not "contrary to law," and that the Defendants are entitled to summary judgment. *See Orloski*, 795 F.2d at 167.[9]

### B. The Challenge to the Commission's Announced Standard is Not Ripe

The Plaintiffs also claim that "[t]he controlling Commissioners' standard for 'similar future cases,' which they refused to apply here, is arbitrary, capricious, and contrary to law." Pls.' Mot. Summ. J. 37 (citation omitted). But as the Plaintiffs admit, that interpretation has yet to be applied in practice, and the challenge is therefore not ripe. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). By applying the ripeness doctrine, courts avoid "entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

---

[9] All six of the Commissioners viewed this case as a straw donor case, not a political committee case. R. at 80 n.36, 90-94. In fact, the General Counsel explained that "an entity can be a conduit or a political committee, but not both." R. at 44. The Plaintiffs argue only in passing that the political committee registration requirements applied. Pls.' Mot. Summ. J. 29. I conclude that the Commission's reliance on the General Counsel's recommendation, and analysis in R. 80 n.36 constitute a rational basis for its decision not to investigate the political committee claims.

This challenge is not even close to being ripe. Not only has the challenged legal interpretation not been applied, but the Commission has yet to formally adopt it. The reasoning of the three Commissioners who voted against investigation constitutes the agency's reasoning for *this* case, *Nat'l Republican Senatorial Comm.*, 966 F.2d at 1476, but "not [] binding legal precedent or authority for future cases." *Common Cause v. Fed. Election Comm'n*, 842 F.2d 436, 449 n.32 (D.C. Cir. 1988) ("The statute clearly requires that for any official Commission decision there must be at least a 4–2 majority vote."). Although the Commission may apply the standard in the future, it may also choose to alter it. *Id.* at 449.

Even the Plaintiffs' own arguments make it obvious how unfit this standard is for judicial review. The Commission decided that "in similar future matters, the proper focus will be on whether funds were intentionally funneled through a closely held corporation or corporate LLC for the purpose of making a contribution that evades the Act's reporting requirements," and that corporate contributions "shall be presumed lawful unless specific evidence demonstrates otherwise." R. at 86. The Plaintiffs argue that "[a]lthough the parameters of the . . . standard have not yet been tested, it appears to be unduly narrow and absolute," Pls.' Mot. Summ. J. 38, and "virtually impossible to prove." *Id.* (quoting R. at 96 (Statement of Commissioners Ravel and Weintraub, dissenting)). Predictive arguments present "the classic institutional reason to postpone review," because "we need to wait for a rule to be applied [to see] what its effect will be" in the fact-rich context of an actual enforcement or non-enforcement case, where the Commission directly applied the challenged interpretation. *See Atl. States Legal Found. v. EPA*, 325 F.3d 281, 285 (D.C. Cir. 2003) (citations and internal quotation marks omitted). I conclude that this challenge is unfit for judicial decision, because the Plaintiffs have not felt the "effects" of the Commission's interpretation "in a concrete way," *Abbott Labs.*, 387 U.S. at 148–49, and

the only hardship that the Plaintiffs face is the speculative possibility that the Commission will apply this standard in a future case to their detriment. *See* Pls.' Reply 35 ("the [Commission's] restrictive . . . standard will likely lead to non-disclosure of further information [in future cases] to which plaintiffs are legally entitled.").[10] A speculative injury does not pass the ripeness test. *E.g. Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending.").

## IV. CONCLUSION

For these reasons, both the Commission's and the Intervenor-Defendants' Motions for Summary Judgment will be granted, and the Plaintiffs' Motion for Summary Judgment will be denied. A separate order will issue.

Dated: June 7, 2018

TREVOR N. MCFADDEN
United States District Judge

---

[10] In their reply, the Plaintiffs argue that one of the Commission's reasons for dismissing the complaints was its desire to avoid "vindicat[ing] the dissenting Commissioners' alternative 'functional' standard for application of section 30122," Pls.' Reply 31, and that "insofar" as this is true, the Commission's *own* interpretation is "directly relevant to the adequacy of the [Commission's] reasoning and ripe for review." *Id.* at 34-35. But the Commission nowhere rests its logic on its critique of the dissenting Commissioners' standard. R. at 82 n.48 (critiquing the dissenting Commissioners' interpretation only in dicta); R. at 86 ("our conclusion that section 30122 applies to . . . corporate LLCs is only the beginning of the analysis.").